# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-1782
_____

Jerry Capps; Jaylene Capps, in their individual capacities and as Personal Representatives of the Estate of Christopher Capps

*Plaintiffs - Appellees*

v.

David Olson, in his individual capacity; Pennington County, a political subdivision of the State of South Dakota

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of South Dakota - Rapid City

_____

Submitted: November 12, 2014
Filed: March 16, 2015

_____

Before MURPHY, MELLOY, and BENTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

     Sheriff's Deputy David Olson shot and killed Christopher Capps (Capps). Capps's parents, Jerry and Jaylene Capps, sued Deputy Olson for using excessive force against their son in violation of 42 U.S.C. § 1983. Deputy Olson alleges Capps was charging towards him with a weapon at the time of the shooting. Capps's parents

allege Deputy Olson shot Capps in the back when Capps was unarmed. Deputy Olson moved for summary judgment based on qualified immunity. The district court[1] denied Deputy Olson's motion, holding that outstanding questions of fact precluded a grant of qualified immunity. For the reasons stated below, we affirm.

I.

On May 2, 2010, Deputy Olson received a report from dispatch regarding a belated assault—one that is not in progress and occurred before dispatch received the report. Deputy Olson was in the area, so he responded to the call. Dispatch reported that a Native American male pushed a juvenile off of his bike and assaulted him. Dispatch also reported that the victim was having trouble breathing.

When Deputy Olson arrived at the scene, he came upon Tammy Scribner. Tammy Scribner informed Deputy Olson that her husband, David Scribner (Scribner), was in pursuit of the suspect, Capps. Deputy Olson chased Scribner and Capps over a barbed-wire fence and through a wooded area. Deputy Olson was not able to see Scribner and Capps until after he exited the wooded area and came to the top of a rise in the ground. From this location, Deputy Olson saw Scribner and Capps approximately 200 to 300 yards away. Capps was running away from Scribner and was about 60 to 70 feet ahead of Scribner. Deputy Olson heard Scribner yelling at Capps but could not understand what Scribner was saying.

The parties dispute what happened next. Deputy Olson claims that he observed Capps turn around and take three steps or so toward Scribner. As Capps was moving towards Scribner, Deputy Olson saw Capps's hand go to the ground "for an instant" but he did not see Capps pick up anything. Capps then began running toward Scribner. Deputy Olson shouted, "Sheriff's Office." Capps then turned toward

---

[1] The Honorable Jeffrey L. Viken, Chief Judge, United States District Court for the District of South Dakota.

Deputy Olson and started to run in Deputy Olson's direction. Capps was about 60 feet away from Deputy Olson when Capps turned. When Capps was about 30 feet away, Deputy Olson saw what he thought was a silver or gray knife with a three to four inch blade in Capps's right hand. Deputy Olson commanded Capps to "go to the ground," "show me your hands," "stop where you are," and "drop the weapon." Capps did not follow the commands, and Deputy Olson fired his gun at Capps five times. Deputy Olson estimated he fired his first shot when Capps was about 20 to 25 feet away and the other four shots when Capps was approximately 15 to 18 feet away.

After Capps fell to the ground, Deputy Olson placed Capps in handcuffs. Deputy Olson radioed dispatch and stated shots fired, one subject down, and weapons unknown. Deputy Olson did not search the area for a weapon after he placed Capps in handcuffs nor did Deputy Olson say anything about a weapon to the first two officers who arrived on the scene after the shooting.

While Capps was still in handcuffs and on the ground, another officer on the scene, Soucy, noticed a piece of driftwood approximately six to eight inches long to the right of Capps's head. Soucy did not see anyone move or touch the driftwood. Photographs taken of the driftwood show that it may have been overgrown by blades of grass. Deputy Olson did not see the driftwood on the ground. An inventory log noted one piece of driftwood was recovered at the scene.

Capps was pronounced dead later that night. Dr. Donald Habbe completed the autopsy report, which noted five gunshot wounds. One of the bullets entered Capps's body through his back.

An officer interviewed Deputy Olson the night of the shooting. Deputy Olson stated that he did not look for the alleged knife because he was concerned about scene security and that he assumed the next responding officer would conduct an evidentiary search. Deputy Olson did not mention a knife to anyone on the scene

after the shooting. He mentioned a knife for the first time at his interview, almost two hours after the shooting. It is undisputed that a knife was not discovered at the scene. Deputy Olson asserted the phrase weapons unknown means "I have not located any weapons on anybody because I'm still occupied with two subjects." The first two responding officers, Hislip and Schmidt, were also interviewed the night of the shooting. Officer Hislip stated weapons unknown means "we were unsure if there [were] any other weapons that were present." And Officer Schmidt stated that the use of the phrase weapons unknown could mean it is unknown if the subject had a weapon.

An officer also interviewed Scribner the night of the shooting. In his interview, Scribner stated that he chased and taunted Capps immediately following the assault. After pursuing Capps for approximately ten minutes, Capps turned towards Scribner and "picked up a rock." Scribner then said to Capps, "oh yeah you're a big guy huh? Got a rock you f—— punk?" But as Capps moved closer to Scribner, Scribner could see Capps "had something in his hand. Like a knife but to me it looked like a sharp stick that he had whittled down to a point." Scribner testified that Capps yelled, "I'm going to kill you." However, according to Scribner, Capps then turned and charged towards Deputy Olson. Scribner heard Capps yell, "I'm going to kill, I'm going to kill you ahhhh" to Deputy Olson. Deputy Olson did not hear Capps yell anything.

After the suit was filed, the attorney for Capps's estate attempted to depose Scribner. Scribner refused to answer questions and referred the attorney to the transcript of the interview from the night of the shooting. As a result, the district court refused to consider Scribner's transcript. The district court denied Deputy Olson's motion for qualified immunity. Deputy Olson timely appealed.

II.

This Court reviews the denial of summary judgment de novo, construing the evidence in the light most favorable to the nonmoving party and drawing all

reasonable inferences in the nonmoving party's favor. <u>Schoelch v. Mitchell</u>, 625 F.3d 1041, 1045 (8th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because this is an interlocutory appeal from a denial of qualified immunity, our jurisdiction is limited to the legal question of whether Deputy Olson is entitled to qualified immunity. <u>See</u> <u>Craighead v. Lee</u>, 399 F.3d 954, 960 (8th Cir. 2005). Factual and evidentiary determinations are not appealable at this stage. <u>Id.</u>

### III.

An official is entitled to summary judgment based on qualified immunity unless (1) the evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation. <u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009).

#### (1) Violation of a Constitutional Right

"Since this case presents an issue of whether an officer used excessive force, the case must be analyzed under the Fourth Amendment's objective reasonableness standard." <u>Craighead</u>, 399 F.3d at 961 (citation and internal quotation marks omitted). The objective reasonableness standard asks "'whether the officer['s] actions are objectively reasonable in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation.'" <u>Id.</u> (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 388 (1989) (internal quotation marks omitted)). An officer's use of deadly force is reasonable if, from the objective perspective of a hypothetical reasonable officer on the scene, the suspect poses a threat of serious bodily harm to the officer or others. <u>Loch v. City of Litchfield</u>, 689 F.3d 961, 965 (8th Cir. 2012). The court "must consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

officer or others, and whether the suspect is actively fleeing or resisting arrest." Id. (citing Graham, 490 U.S. at 396).

Deputy Olson argues that his use of force was reasonable under the circumstances. He asserts that the alleged assault was a serious crime, Capps was fleeing the scene, and Capps posed an immediate threat to Deputy Olson and Scribner. We must, however, consider the totality of the circumstances in the light most favorable to Capps. See Craighead, 399 F.3d at 960. The district court found two overarching factual disputes precluded a grant of summary judgment—(1) whether Capps was moving towards Deputy Olson during the shooting and (2) whether a reasonable officer could have believed Capps was armed.

It is undisputed that one of the five bullets entered through Capps's back. Capps's expert, Charles Stephenson, testified that Deputy Olson's *first shot* entered through the back of Capps's left shoulder. According to Stephenson, "[t]his indicates . . . Capps was turned away from Olson when Olson [fired] his first round at Capps." Stephenson concluded "that after Capps was struck in his left rear shoulder he partially turned towards Olson and was struck four additional times with four rounds entering the anterior of his chest cavity and traveling downward left to right; which indicates that Olson was standing to the left of and above Capps." Deputy Olson's expert, John Ryan, disagreed with Stephenson's analysis; Ryan testified that "[s]ubjects sometimes slump forward, spin or lunge forward during a shooting in a manner that leads to a wound in the back."

We agree with the district court that whether Capps was moving towards Deputy Olson when Deputy Olson fired the first shot is a disputed material fact that bears on the reasonableness of the use of force. Because we must construe the facts in the light most favorable to Capps at this stage, we accept Stephenson's conclusion that Capps was not facing Deputy Olson when Deputy Olson fired his first round.

The district court also correctly held Deputy Olson's use of the phrase weapons unknown and the other evidence regarding the possible presence of a weapon reasonably could be interpreted by a jury to mean that Capps did not have a weapon and that Deputy Olson did not believe Capps had a weapon. Officer Schmidt stated the use of the phrase weapons unknown could mean it is unknown if the subject has a weapon. Further, Deputy Olson did not look for a weapon at the scene nor did he alert the first two responding officers about the presence of a weapon. The first mention of the knife was almost two hours after the shooting.

Furthermore, even if a suspect is ultimately found to be unarmed, a police officer who reasonably believes a suspect is armed and dangerous may still employ deadly force. "An act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment." Loch, 689 F.3d at 966. Whether the piece of driftwood was in Capps's hand or could reasonably be mistaken for a weapon is a factual question for a jury. Because the driftwood may have been overgrown by blades of grass and Deputy Olson did not see the driftwood, it would be reasonable for a jury to find that the driftwood was not in Capps's hand and that Deputy Olson did not actually mistake the driftwood for a weapon.

Deputy Olson also argues the district court erred when it refused to consider Scribner's testimony. The district court stated it would not "adopt [Scribner's] description of events when Scribner refused to permit plaintiffs' counsel to examine him about the events which occurred on May 2, 2010." Even assuming the district court erred by not considering Scribner's testimony, there are still genuine issues of material fact that preclude summary judgment—whether Capps was moving towards Deputy Olson during the shooting and whether Deputy Olson reasonably believed Capps was armed. Scribner's testimony merely contradicts the evidence presented by Capps. At this stage in the case, we are required to view the controverted facts in the light most favorable to Capps.

This Court must presume Capps was not facing Deputy Olson and Deputy Olson did not believe Capps possessed a weapon at the time of the shooting. If the jury were to determine that Capps refused to listen to Deputy Olson's commands and moved towards Deputy Olson with what appeared to be a weapon, the use of deadly force could have been objectively reasonable. However, taking the evidence in the light most favorable to Capps we must conclude there is a factual dispute as to whether Deputy Olson violated Capps's Fourth Amendment right against excessive force.

(2) Clearly Established Constitutional Right

Even if the jury could conclude a constitutional violation occurred, qualified immunity still protects an officer if the right defined in the specific context of the case was not clearly established. "[T]he right the official is alleged to have violated must have been clearly established in a . . . particularized . . . sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987) (internal quotations marks omitted). "The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." Tolan v. Cotton, 134 S.Ct. 1861, 1866 (2014) (per curiam) (internal quotation marks omitted). "This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled on other grounds by Pearson, 555 U.S. at 236.

The use of deadly force against a fleeing suspect who does not pose a significant and immediate threat of serious injury or death to an officer or others is not permitted. Nance v. Sammis, 586 F.3d 604, 610 (8th Cir. 2009); Moore v. Indehar, 514 F.3d 756, 763 (8th Cir. 2008); Craighead, 399 F.3d at 963; cf. Krueger v. Fuhr, 991 F.2d 435, 440 (8th Cir. 1993) (approving use of deadly force against

fleeing suspect who poses threat of death or serious injury even if another officer might later apprehend suspect). "For a constitutional right to be clearly established, there does not have to be a previous case with exactly the same factual issues." Nance, 586 F.3d at 611. "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question . . . ." United States v. Lanier, 520 U.S. 259, 271 (1997). "Hence, the issue is not whether prior cases present facts substantially similar to the present case but whether prior cases would have put a reasonable officer on notice that the use of deadly force in these circumstances would violate [the plaintiff's] right not to be seized by the use of excessive force." Craighead, 399 F.3d at 962. "[I]n an obvious case, [general] standards can clearly establish the answer, even without a body of relevant case law." Brosseau v. Haugen, 543 U.S. 194, 199 (2004) (internal quotations marks omitted). Based on the facts we are required to assume, Capps did not pose a threat of significant bodily injury or death to Deputy Olson or Scribner. And Deputy Olson had fair and clear warning at the time of the shooting that the use of deadly force against a suspect who did not pose a threat of serious bodily injury or death was unconstitutional.

Therefore, the contours of the right were sufficiently clear—a reasonable officer would have understood that use of deadly force against a fleeing suspect who does not pose a significant and immediate threat of serious injury or death to an officer or others is not permitted.

IV.

We affirm the district court's denial of Deputy Olson's motion for summary judgment. There are genuine issues of material fact. At this stage in the proceedings, Deputy Olson is not entitled to qualified immunity as a matter of law.

_____

- 9 -